No. 38.—NANCY CORLEY, (by her next friend,) plaintiff in error, *vs.* AUSTIN W. CORLEY, and others, defendants in error.

Where slaves are given by A in trust for the support and maintenance of his daughter and her children, during the lifetime of the daughter, and at her death, the negroes and their increase to be equally divided between the children of the daughter; and upon the death of the trustee, the property is taken possession of by the daughter, who permits each of her children as they marry or come of age, to take away one, two or three of said slaves:

*Held*, [1.] That a receipt by the husband of one of the girls, for three negroes, specifying, that they were received as his and his wife's share of the donor's estate, was not such a reduction to possession of his wife's share of the negroes, as to defeat her equity to a settlement out of the property thus given by her grand father.

[2.] That as the husband or his creditors, or the purchasers of his interest in and to this property, would have to go into equity to effect a distribution of the property, a Court of Equity would interfere and restrain, by injunction, the proceedings, until a suitable provision was made for the wife and children.

In Equity, from Meriwether Superior Court. Decision on demurrer by Judge BULL, at February Term 1857.

This was a bill filed by Nancy Corley, wife of Austin W. Corley, by her next friend, against said Austin W., her husband, John Jones, and other judgment creditors of the said Austin W. Corley.

The bill alleges that John Arledge and Ann Arledge, the grand-parents of complainant, residing in Edgefield District, South Carolina, conveyed by deed of trust, dated the third day of December, 1816, to one Mark Mathis, three negro slaves, to be held by him for the maintenance and support of Esther Weeks, their daughter, and her children, for and during her life, and at her death, said negroes and their increase to be equally divided amongst said Esther Week's children, which she then had, or may have, at the time of her death, and if at any time said trustee should refuse said maintenance and support, said slaves to revert to the donors or their heirs. Under and by virtue of said deed, the slaves

went into the possession of said Mathis, who took upon himself the execution of the trust. About four years thereafter, Mathis died, and no one being appointed or substituted in his place, said Esther took possession and control of said slaves and continued to hold the same until about 1826. At this time, her oldest daughter intermarried, and she permitted her husband to take into his possession two of the said negroes. In 1828, another daughter married, and she permitted her husband to take *one* of said negroes into possession; and thus she continued to permit each one of her children, as they became of age or married, to take into their possession one or two and sometimes three of said slaves.

Mrs. Corley the complainant, and who was one of the children of said Esther Weeks, intermarried with Austin W. Corley, in the year 1830, and about two years thereafter removed to the State of Georgia; and afterwards, when on a visit to South Carolina, about the year 1834, for the first time, said Esther permitted her husband to take into possession and bring with them to their home, in Georgia, three of said negroes, and he gave to said Esther a receipt for the same, specifying that they were received as their share of John and Ann Arledge's estate.

The bill further alleges that said slaves have increased to more than forty, and are in the possession of the children of said Esther, obtained by them as aforesaid, and of the aggregate value of about $28,000. That said Esther had seven children, who are residing at this time in the States of South Carolina, Georgia and Alabama.

The bill sets out the number and value of the slaves in possession of each child. Some having as many as nine or ten and others but one or two, and so on. That complainant and her husband have in possession nine of said slaves, worth about $4,400: That said slaves have been levied upon by the Sheriff of said county, under and by virtue of various judgments and *fi. fas.* against said Austin W. Corley her husband, and removed and taken out of the possession of

said complainant and her husband by said Sheriff. That upon the application of complainant, Levi M. Adams was appointed, by the Superior Court of said county, trustee, who interposed a claim to said slaves, and upon complying with the terms of the statutes in such cases provided, took said slaves into his possession where they have since remained. That said claims are still pending and undecided. That in October, 1856, (said claim still pending,) the said Esther Weeks departed this life, in Edgefield District, South Carolina, and that no division or partition of said slaves was made amongst the children of said Esther during her life, nor has any been made since her death.

That complainant has eight children, five of whom are so young as to be unable to support themselves ; that said nine negroes, consist of two women and children worth not more than $100 per annum ; that she has no other means of support, except that to be derived from the use and services of said slaves, and that her husband is hopelessly insolvent.

The bill prays for a distribution of all the slaves, both in and out of the State, or for a distribution of the slaves in this State; for a settlement of the share or estate due and belonging to complainant, under and by virtue of said trust deed, upon herself and children, free from the debts or contracts now or hereafter existing against, or made by, her husband, and from the lien or claims of the said judgment; for injunction, &c.

To this bill the judgment creditors of Austin W. Corley, defendants, filed a demurrer, which the Court sustained and dismissed the bill.

To which decision plaintiff's counsel excepts, and assigns error thereon.

HALL, DOUGHERTY and WARNER, for plaintiffs in error.

B. H. HILL, and McMATH, for defendants in error.

Corley vs. Corley et al.

*By the Court.*—LUMPKIN J. delivering the opinion

[1.] Had Austin W. Corley, the husband of Nancy Corley, the complainant in the bill, so reduced to possession his wife's share of the negroes deeded to her by her grand parents, John and Ann Arledge in 1816, as to defeat her equity to a settlement out of said property? For we hold, that if, before any proceedings be instituted in relation to the slaves, they had been transferred to the husband by the person entitled to the custody of the same—as it lawfully may be—the transfer will be good; and it is afterwards too late to apply to a Court of equity for its interposition for a settlement on the wife and children.

What are the facts? The negroes were conveyed in trust to Mark Mathis, to be held by him for the maintenance and support of Esther Weeks, their daughter, and her children, for and during her natural life; and at her death, said slaves and their increase, to be equally divided between said Esther Weeks' children, which she then had or might have at the time of her death. Mathis the trustee, lived about four years and died, and no one was appointed in his place. The slaves and their increase were taken possession of by Esther Weeks, and held and controlled by her until 1826, when her oldest daughter intermarried, and she permitted her husband to take off two of the negroes. In 1828, another daughter married, and she allowed her husband to carry off *one* of said negroes; and thus she permitted each one of her children as they severally came of age or married, to take one or two and sometimes three of said slaves.

Mrs. Corley, the complainant, who was one of said children, intermarried with Austin W. Corley in 1830; and in 1832, removed to the State of Georgia.

In 1834, when on a visit to South Carolina, her mother suffered her husband to bring with him to Georgia three of said slaves, for which he gave a receipt to the said Esther,

specifying that they were received as his and his wife's share of John Arledge's estate. Esther Weeks died in 1856. Whether each of the other children executed a similar instrument, or any at all, does not appear. Neither is it shown whether the portions thus allotted off were of equal or unequal value, or what became of the property left with Esther Weeks after the termination of her life estate.

The position occupied by the learned counsel for the creditors is, that notwithstanding the division thus made had no binding force until the whole of the children had severally ratified it; yet when the last child received his share, the implied consent of the whole was given thereto, and the distribution was complete. But this assumes that every child received an equal portion, or at any rate, a share with which he was satisfied, and granted an acquittance similar to that given by Corley, and that too in the face of the positive allegation in the bill, which is admitted by the demurrer to be true, that neither before nor since the death of Esther Weeks has there been any distribution of the negroes.

But we apprehend there is another stubborn difficulty in the way. To make this transaction such a reduction to possession of this property by the husband, as will cut off and defeat the wife's equity, it must amount to a relinquishment by each of the remainder-men to all the rest of any other or further interest in and to the property, including necessarily the wife's equity to a settlement, and this she has never given. It is true, she may voluntarily part with this right, but the husband cannot convey it without her consent. By the terms of the deed, there was not to be a division of the property until the death of Esther Weeks. Adams was appointed trustee, by order of the Judge under the Act of 1853, in lieu of Mark Mathis deceased, before the death of Esther Weeks, and had in his posession as such trustee, at the time of her death, the nine negroes in controversy. By order of the Judge, acting as chancellor, the legal title to the negroes

was assigned to Adams the trustee, who held them in trust, for the use, behoof and benefit of Mrs. Corley, according to the terms and conditions of the original deed, as fully and completely as Mark Mathis, had he continued in life. *Hill on Trustees* 41, 45, 48, 211.

We repeat, therefore, that it was not competent for the husband, in 1834, to execute such an assignment, upon the receipt of a part of the property, as would defeat the wife's equity; she not of her own accord joining therein with him. The receipt given by Corley must be construed to extend only to such an interest as the tenant for life had in the property. It was only a receipt for the *use* of a portion of the property during Esther Week's life, and not for the *corpus*. To this Corley was entitled: and a Court of equity would not only have sanctioned, but coerced by its decree, just such an arrangement, without interfering at all with the wife's equity.

[2.] Could Corley himself, or his creditors, or the purchasers of his interest in this property, which is the surplus, if any, after a suitable settlement is made for the wife of this insolvent and her eight children, effect a division of the negroes without resorting to a Court of equity? We know of no mode *at law* of partitioning this property, and counsel have suggested none. That being the case, equity will interfere and restrain, by injunction, the sale of this property at the instance of the husband's creditors, until a suitable provision is made. *Kenney vs. Udal,* 5 *Johns. Ch. Rep.* 464.

Judgment reversed.